47 So.3d 801 (2009)
Ex parte Tonya BLACKSTOCK.
(In re Mark Davis v. Tonya Blackstock).
1061445.
Supreme Court of Alabama.
September 11, 2009.
Rehearing Denied February 19, 2010.
*802 Lindsey Mussleman Davis of Holt, Mussleman, Holt & Morgan, Florence, for petitioner.
Heath F. Trousdale, Florence, for respondent.
PER CURIAM.
This case involves a dispute between Tonya Blackstock ("the mother") and Mark Davis ("the father") concerning the custody of their daughter ("the child").

A. Procedural History
The Court of Civil Appeals in Davis v. Blackstock, [Ms. 2060017, June 29, 2007] 47 So.3d 796, 797 (Ala.Civ.App.2007), summarized the history of this case:
"The father and the mother married on November 11, 2000. Four months later, while they were residing in Tennessee, the father and the mother separated. The mother was pregnant with the child at the time of the separation. *803 Subsequently, a petition for divorce was filed in the Chancery Court for Lawrence County, Tennessee (`the Tennessee trial court'). Before the Tennessee trial court ruled on the divorce petition filed with that court, the father and the mother moved to Alabama, where the mother gave birth to the child on December 27, 2001.
"On February 15, 2002, the Tennessee trial court entered a judgment divorcing the father and the mother. In essence, the Tennessee judgment granted the father and the mother joint custody, with the mother receiving primary physical custody and child support. In June 2002, while the father, the mother, and the child continued to reside in Alabama, the father petitioned the Tennessee trial court for a modification of its February 15, 2002, judgment with regard to custody. On September 3, 2003, the Tennessee trial court modified its divorce judgment by granting the father equal physical custody on a four-day rotating basis and terminating the father's child-support obligation."
47 So.3d at 797. The mother appealed, and the Tennessee Court of Appeals affirmed the custody-modification order but remanded the cause for further proceedings relating to ancillary matters. Id. When the parties moved to Alabama, the mother moved to Florence and the father moved to Decatur.
In February 2006, the mother filed a petition in the Lauderdale Circuit Court seeking a modification of custody and child support.[1] Reiterating statements from her sworn answers to interrogatories, the mother testified at trial as to several allegedly material changes in circumstances that, she claimed, warranted a change in the September 2003 custody award, including that the child would begin attending pre-kindergarten classes ("the pre-K program") in the fall of 2006; that the pre-K program was a "structured" program and the child would be required to attend every day;[2] that the child would need daily "structure and stability" at that time; that the four-day rotating-custody arrangement ("the four/four custody arrangement") "minimize[d] stability" for the child and would make it more difficult to stay on a routine with regard to the pre-K program; that as "[the child's] gotten older, she's shown increased anxiety over the constant change of environment, and has voiced dissatisfaction with the constant change"; and that the father "told the Tennessee court he would move to Florence when [the child] got older" and he has not done so.
The father opposed the mother's modification petition, and, a few days before trial, he filed a counterpetition seeking "primary physical custody" of the child on the grounds that the mother had attempted to alienate the child from the father and that she had
"involve[d] the four (4) year old child in adult matters as well as proceeding to enroll the child in an educational type program without consulting and receiving permission from the [father] and knowing that in the current custodial *804 arrangement, the child cannot participate. These are all issues that have developed since the filing of this action, although others exist to support the change of custody."
After an ore tenus hearing, the Lauderdale Circuit Court entered a judgment in September 2006 that (1) maintained the joint-legal-custody award to the parents, (2) awarded the mother primary physical custody, (3) awarded the father "standard visitation,"[3] with the addition of visitation "every Tuesday from when the child is discharged from school until 8:00 p.m.," and (4) ordered the father to pay child support. The father appealed.
In reversing the judgment of the Lauderdale Circuit Court, the Court of Civil Appeals stated:
"Based on the totality of the evidence, we conclude that the mother failed to meet her burden of showing that a material change of circumstances had occurred that affected the child's welfare since the last custody order. See, e.g., Watters v. Watters, 918 So.2d 913, 916-17 (Ala.Civ.App.2005). The evidence shows that the only change that has occurred has been the natural progression of the child to prekindergarten school. However, the mother has not demonstrated how this change, in the context of the joint-custody arrangement, has affected the child's welfare or best interest. The evidence shows that the child could attend prekindergarten part-time and that the father could instruct the child on the days she did not attend. The child thrived in a similar arrangement in day care. The mother presented no evidence to indicate that the child would not continue to thrive while in pre-kindergarten under the same arrangement. The only other relevant evidence the mother presented showed that the child expressed anxiety at exchanges and that she would miss school, church, and extracurricular activities if the current custody arrangement was maintained. However, as the father points out, even under the physical-custody arrangement approved by the Alabama trial court, the child would still experience exchanges and would still miss activities.
"Accordingly, we reverse the Alabama trial court's modification of the 2003 custody judgment."
47 So.3d at 800-01.
In her petition to this Court for a writ of certiorari, the mother contends, in part, that the Court of Civil Appeals' decision conflicts with prior precedent. Specifically, she argues (1) that the Court of Civil Appeals' decision conflicts with Lamb v. Lamb, 939 So.2d 918 (Ala.Civ.App.2006), because, she says, the Court of Civil Appeals improperly reweighed the evidence and did not give effect to the presumption of correctness afforded the trial court's judgment in ore tenus cases and (2) that the decision conflicts with, or misapplies, the holding in Watters v. Watters, 918 So.2d 913 (Ala.Civ.App.2005), on which the Court of Civil Appeals relied. We agree.

B. Standard of Review
Where, as in the present case, there is a prior judgment awarding joint physical custody, "`the best interests of the child'" standard applies in any subsequent custody-modification proceeding. Ex parte Johnson, 673 So.2d 410, 413 (Ala. *805 1994) (quoting Ex parte Couch, 521 So.2d 987, 989 (Ala.1988)). To justify a modification of a preexisting judgment awarding custody, the petitioner must demonstrate that there has been a material change of circumstances since that judgment was entered and that "`it [is] in the [child's] best interests that the [judgment] be modified'" in the manner requested. Nave v. Nave, 942 So.2d 372, 376 (Ala.Civ.App. 2005) (quoting Means v. Means, 512 So.2d 1386, 1388 (Ala.Civ.App. 1987)).
Also, we note the presumption of correctness accorded to a trial court's judgment:
"When this Court reviews a trial court's child-custody determination that was based upon evidence presented ore tenus, we presume the trial court's decision is correct: `"A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong...."' Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. `In child custody cases especially, the perception of an attentive trial judge is of great importance.' Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ. App.1981)."
Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001).
As this Court stated in Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996), quoted in part in Lamb, in an ore tenus proceeding,
"[t]he trial court is in the best position to make a custody determinationit hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing. See Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994), wherein this Court, quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala. Civ.App.1993), set out the well-established rule:
"`"Our standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal,... and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow...." '"
676 So.2d at 1324; see Lamb, 939 So.2d at 922; see also Ex parte Foley, 864 So.2d 1094, 1099 (Ala.2003) ("[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow." (citation omitted)).
"`[T]he trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.'" Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997) (quoting Ex parte Bryowsky, 676 So.2d at 1326). "Thus, appellate review of a judgment modifying custody when the evidence was presented ore tenus is limited to determining whether there was sufficient evidence *806 to support the trial court's judgment." Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala. Civ.App.2007) (citing Ex parte Patronas) (emphasis added). Under the ore tenus rule, where the conclusion of the trial court is so opposed to the weight of the evidence that the variable factors of a witness's demeanor and credibility and the inferences that can be drawn from the evidence, even after considering those factors, "`"could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed." '" Cheek, 1 So.3d at 1029 (quoting B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999), quoting in turn Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979) (emphasis added)).
Further, where, as in the present case, the trial court does not make detailed written findings of fact, we "`will assume that the trial court made those findings [of fact] necessary to support its judgment, unless such findings would be clearly erroneous.'" Ex parte Fann, 810 So.2d at 636 (quoting Lemon v. Golf Terrace Owners Ass'n, 611 So.2d 263, 265 (Ala.1992)).

C. Analysis

1. Deference to the Lauderdale Circuit Court's Findings
The holding of the Court of Civil Appeals is phrased in terms of that court's conclusion as to whether the mother met her burden of proof: "Based on the totality of the evidence, we conclude that the mother failed to meet her burden [of proof]." 47 So.3d at 800. As noted, however, the question is whether the circuit court heard and saw sufficient evidence that, based on that evidence and the inferences the circuit court reasonably could have drawn from it, the circuit court reasonably could have made the factual findings and reached the conclusion that it reached. After careful review, we conclude that the Court of Civil Appeals failed to give appropriate deference to the circuit court's implicit findings and resulting judgment.
Upon the mother's appeal from the September 2003 order of the Tennessee Chancery Court, the Tennessee Court of Appeals issued an unpublished opinion, Davis v. Davis, (No. M2003-02312-COA-R3-CV) (Tenn.Ct.App.2004), a copy of which was introduced into evidence at trial in the present case.[4] In that opinion, the Tennessee Court of Appeals stated the following concern about the four/four custody arrangement:
"During oral argument, this court expressed some concern about the longterm viability of the revised residential schedule because the parents are currently living in different cities that are more than one hour's drive apart. Shuttling [the child] back and forth every four days will no longer be in her best interests when she begins school. [The mother] insists that these potential difficulties provide a sufficient basis to vacate the revised residential schedule and to designate her as the primary residential parent. We respectfully disagree. Courts must base their decisions on the evidence of what has already happened, not on speculation about what might happen in the future. These parents have the power to avoid these potential difficulties by working out a mutually satisfactory parenting arrangement once [the child] begins school."
(Emphasis added.) Also, it is undisputed that the father represented to the courts in *807 Tennessee that he would move to Florence when the child began school, if not sooner.
After the four/four custody arrangement was established, the mother enrolled the child in a weekday day-care program at First Assembly Childcare and Development Center in Florence. Thereafter, the father exercised his custody rights so that the child was not in day care on the weekdays he had custody, though he did have to leave the child with relatives on occasion because of his work schedule; the father was self-employed as a photographer and also taught occasionally as an adjunct faculty member at a local college.
In the spring of 2006, the mother determined that she would like to enroll the child in a pre-K program in the fall of 2006 in order to prepare her for kindergarten. Although the parties had disputes concerning whether the father was properly involved in the initial decision to enroll the child in a pre-K program and as to which pre-K program should be used, they eventually agreed to enroll the child in the pre-K program at First Assembly.[5] We note that at trial the father did not dispute that enrollment in the pre-K program at First Assembly was in the child's best interest. Instead, he argued that he could adequately compensate for the time the child would miss from the pre-K program when she was in his custody, as he had when she was in the day-care program. In that regard, much of the testimony at trial concerned the nature of the pre-K program and the impact the four/four custody arrangement would have on the benefits the child might obtain from the program. See discussion infra. There was also testimony, however, concerning some of the negative impacts the four/four custody arrangement, in and of itself, was having on the child.[6] For example, both the mother and the maternal grandmother testified that the child suffered anxiety at the custody exchanges with the father and that her anxiety had grown worse as she got older. In part, the mother testified:
"Q. What other, if any, changes have you seen in [the child]? And we are talking about leading up to your filing this, that made you realize there had been changes, that this plan needed to be revisited, in her demeanor, her actions, any, did you see any indications about how this was affecting her life or impacting her?
"A. On the fourth day, [the child], she's like a totally different kid. She asked me why, and blamed me for having to carry her, I mean like I don't want her. I'm afraid that she's going to, I mean, she asked me why I'm sending her to daddy's, do I not want her to stay there? She procrastinates when she gets home. My mom picks her up sometimes from day care and has her fed before we go *808 back. And she runs from room to room, just wanting me to play with her, color. She says, `Carry me back tomorrow night. Daddy won't care,' anything just to prolong us getting there. Then at the exchanges, she cries and holds on to me. And not this past exchange but the one before that, we had gone in the store. She just balked on us, and she didn't want to go. And I went around to the back to talk to her. Mark went around to the back to talk to her. Mark was even telling her, you know, they would go swimming, they would, you know, he would get her this and that. And then finally, she said, `Well, I gotta go to the bathroom.' So we went in the bathroom. I pulled up to the store where we meet. Everything was okay. Mark bought her some candy. We walked out. And I thought, okay, everything is going to be okay. So then Mark gets her hand, you know, they were walking. And I'm starting to back up. And I look in my rearview mirror, and [the child's] running back to the car, screaming and crying. So Mark runs after [the child], picks her up. And then I'm driving by, with her hands out like this for me to get her.
"Q. And these problems have been going on for several months leading up to you filing the petition. But they are getting even worse?
"A. Right."
Furthermore, in regard to the pre-K program, Brenda Coleman, a teacher in the program at First Assembly, testified that the pre-K program involved a "more structured teaching" than the day-care program and that it was designed to prepare children for the kindergarten program in the school system. The pre-K program operated in a classroom setting with a curriculum to follow. Coleman testified:
"Q. And please just summarize the curriculum that you follow and how it's structured or what's provided.
"A. Okay. We teach the [A] BEKA Bible curriculum from Pensacola Bible College. It has the alphabet, the numbers, the readiness skills, crafts and things that they need, to use the fine motor skills, and to learn the things they need to get ready for kindergarten. And we have, in my classroom, we have five books that we teach from. And each emphasizes different things. We have a Bible story book also we do stress the importance of.
"Q. And the curriculum that's set out here on Defendant's Exhibit 3, it has what we have been calling loosely instructional time where you are talking about work books?
"A. Mm-hmm.
"Q. Are there other times of the day that you feel the children are learning?
"A. I feel the children are learning all day, because everything we do is geared toward teaching them to follow directions and getting along with other children, and skills like that. And we have the sitdown classroom time, which is this part, part of this that you see is workbook time. That's the sit down. But as you know, children learn all different ways than just to sit down. Writing time with their books is not the only time of the day that we are learning.
"Q. So not trying to, if I understand you correctly, are you saying that all day long, y'all are trying to focus on preparing for the things they need for school?
"A. Yes. We have a more structured [program] than just a day care. Structured, getting them ready, like I said, to handle when they do go to kindergarten.
"Q. Do you considerwell, first of all, let me ask you, how many days a week *809 do y'all teach in a pre-K structured environment?
"A. Five days.
"Q. So five days of teaching is offered?
"A. Yes.
"Q. Is it offered that a child can go part-time?
"A. Yes, it is. And in my classroom.
"Q. And what days would a child, if the child was going part-time, what days would a child be there?
"A. Normally, it's Monday, Wednesday, and Friday. But sometimes we are flexible with that.
"Q. Okay. Do you have an opinion as to a child, the importance of attendance?
"A. Well, of course the more classroom time and teaching time you get, of course that's beneficial. So if they are there five days, then they are going to get more than if they are there two or three days. That's common sense.
"Q. Is there anything about this particular instruction method or workbook method that makes regular attendance even more important in your eyes, about how those workbooks work or anything?
"A. Well, they are all, they are correlated to work together. And something we'll do maybe on a Monday, Tuesday would be just reemphasizing it in a different way, because repeating things is how children do learn. So naturally we are building all week.
"Q. So one day is building on the next day?
"A. Yes.
"Q. So do you consider regular attendance to be important?
"A. Yes."
Although Coleman testified that, as a teacher, she could adapt to the child's four/ four custody arrangement and that she would work with the father in coordinating the child's schoolwork, she also stated:
"Q. And would you think that a parent could at home do as good of a job, or the same job that you can do with peer interaction in classroom preparedness, and follow the teacher's instruction and classroom discipline, and those kind of things, as far as getting ready for real school kindergarten?
"A. Well, it wouldn't be the same. Because I think having the peers there is part of the learning, how to get along with others, and how to work well together."
Likewise, Myra Carter, a licensed social worker who specialized in parenting and who attended church with the mother and the child, testified as follows:
"Q. ... I think you have previously testified about some acting out when she was younger
"A. (Nods head affirmatively)
"Q. after some extended visitation?
"A. Right.
"Q. Have you noticed any of that?
"A. She's more clingy, I notice, when she comes back, with her mom, not wanting to drop her off to her room, and needs to stay out with the hall with me for a little while until I can sort of coax her back in. And she doesn't normally do that. She likes her friends, and you know, those kind of things.
". . . .
"Q. And as far as the current parenting plan, you are very familiar with their four day on, four day off?
"A. Right.
"Q. Based on your experience, do you have an opinion as to whether that, and based on what you have seen from [the child] and the actions you have seen, but further, based on your experience and your training and your knowledge, do *810 you have an opinion as to whether that would be in [the child's] best interest?
". . . .
"A. If I were writing a behavior plan or a parenting plan in my capacity with family connections, no, I would never encourage four here, four there, for the simple reason that it makes it very difficult for both parents, but especially for the child. It's hard for them to build or to be a part of something on a consistent basis. You know, and any time in a divorce situation, it's all about the child and, you know, just making sure that they are comfortable and making sure that they understand and know that both parents need them to feel comfortable and to thrive. And I think that would be the goal, to see a child her age, we want to see her develop and grow.
"Q. Talking about developing, can you talk a little bit or explain a little bit the importance of a stable plan or stable environment? And I keep hearing and reading at different times about this continuity term, of the continuity of experience. Can you talk a little bit about that as it applies to development of a child?
"A. Well, I think consistency is very important, even for us as adults. I think consistently being and understanding, you know, this is her world here. She has two separate worlds, two separate different places. And so it's really hard to implement something, or to grow and develop in two totally different worlds, like that.
"Q. And I guess the flip side of that is, to a certain extent, isn't that always the reality we are faced with, with a divorce situation?
"A. It is. But usually there is at least a littlefour here and four there is, you know, a little bit harder, I think. You know, I've not ever heard of that personally.
"Q. You think that's the extreme?
"A. I think that's very much the extreme.
"Q. As far as your opinion on that issue, do you have an opinion as to what type of plan might could work in a situation like this, where you have two good, both parents fit, good, loving, involved
"A. Absolutely, uh-huh.
"Q. that want to be involved, and want to participate? Do you have an opinion of what type of plan would be beneficial to [the child] and in her best interest?
"A. Pick one location and let her start developing and building a life, I think, would be very, very positive, because there is already enough negatives even in a great situation that she would work through. I just think that she could thrive in a situation where she feels like she could make friendships, get to know people, build on that. And I agree, I think both parents would want the best interest, you know, have the best interest of this child.
". . . .
"Q. Okay. As far as encouraging involvement with the other parent, you fully support two parents being active and involved in a child's life, don't you?
"A. Oh, absolutely. Most definitely.
"Q. So is it your opinion that you just feel a primary residential designation, primary physical custodian is in the best interest of a child so that a child can participate and have stability, and develop her own life experience?
"A. That's exactly right. She has to come back in and start new every time she comes back there or comes back here. I mean it's a new situation for her.

*811 "Q. Okay. And there's been a lot of talk, were you familiar with [the child's] starting pre-K?
"A. Yes.
". . . .
"Q. ... But as far as stability and having those experiences, you would say that would apply to a pre-K setting as well as church or extracurricular
"A. Definitely.
". . . .
"Q. When you testified ... in the [Tennessee Chancery Court] proceeding, did you express concerns that would be relevant if there was a lack of stability in a child's life?
"A. Yes.
"Q. And based on what you have seen in [the child's] demeanor, and in this current situation with four on and four off, have your concerns been alleviated, or have they been confirmed?
"A. No. I still think there needs to be a consistent plan, one place, for her to be able to thrive and to grow.
"Q. Okay. And have, again, have you seen some of those concerns?
"A. Again, yeah.
"Q. Okay. And those concerns have not gone away?
"A. Correct.
"Q. Do you expect the negative impact that you talked about with friends going on and her not being able to be involved, and activities and those types of things, would you expect those to get better or worse as she gets a little older?
". . . .
"A. Definitely. It will do nothing but get worse."[7]
Furthermore, Robert D. Young, professor of early childhood education at the University of North Alabama, testified:
"Q. What do you consider to be some of the most important factors as far as a well-adapted, appropriately developed, important factors in the child development, to achieve an appropriate child development in a child
"A. One of the most important factors in a young child's life is what the literature will call continuity of experience. And that would mean in all areas that would fall under the areas of the realms of cognitive, physical, social, and emotional. So that would be learning activities, scheduling, play time, individual group, how the parents and caregivers interact with the child, discipline, and so forth. The more consistent it is, the better it is for the child's overall development. It has an impact on things such as the child's ability to trust, to take initiative in learning experiences, to get to the point where they want to accomplish tasks. They take pride, and, through that, develop self-esteem through their accomplishments and so forth. If the continuity is broken every so often, it's not a major detriment. If it's a continual upset in the child's experiences, it can cause, well, the opposite of things I just mentioned, a lack of trust, a lack of willingness to take initiative. It can develop feelings of guilt, shame, doubt, in one's own abilities and so forth. A child will, with the continuity of experiencemost children are natural risk takers in their learning. They *812 are very interested in figuring out the world. When there is less consistency in the child's life, it has a negative effect on their willingness to take risks in learning situations, so that they become more inhibited, more cautious. And that would inhibit their learning as well. A child, during these yearsthere is another term called mastery through repetition. A child needs a great deal of time to go over and over the same activity, the same experience. That's why you will have a young child ask the parent or caregiver to read the same book over and over again. They instinctively have that desire for repetition. They have to; it takes them longer to process their learning than it does us, at the adult level. So they need that extended period of times for repetition. And going back to the continuity of experiences, with the continuity the opportunities for adequate repetition helps the child master the learning experiences. And that's not just the cognitive learning, but it's social, emotion, and physical as well.
"Q. As far as that continuity of experience, would you in your opinion, have a concern that that may be broken if a child didn't attend a pre-K program regularly?
"A. If they were, if their attendance was haphazard?
"Q. Yes.
"A. Oh, absolutely. It would have a detriment. Could be significant.
"Q. What if their attendance at a church with their peer group in their church child's group, was that same way?
"A. Well, I was going to say children. But all of us have a desire to feel as if we belong with a group, so forth. If a child's experiences with the group and attendance with the groups, the times they meet and so forth, is broken, is interrupted for whatever reason, the child might not develop that sense of belonging. And through that, a sense of love, being able to receive it and give it, and so forth, with their, whatever group it would be. So yes, I would.
"Q. Do you have any opinion as to how a custody plan of a four-day, or parenting plan with four days with one parent in Florence, followed by four days with one parent in Decatur, may affect a child adversely or benefit a child, or have any impact on this continuity that you are talking about?
"A. I would not see a benefit to the child. My feelings when I heard about that was, the decision was not made on the best interest of the child. It was made, I won't try to guess why it was made. But I cannot see it as being in the best interest of the child for any way."
The foregoing testimony would support a conclusion by the circuit court that the four/four custody arrangement had become problematic for the child and that the problems were only going to get worse when the child began the pre-K program.
In addition, we note that there was some consideration given at the prior custody proceeding in Tennessee to the father's relocating from Decatur to Florence when the child began "school." Though the "school" under consideration at the time apparently was kindergarten, the parties agreed to enroll the child in the pre-K program. The Tennessee Court of Appeals noted that there might be problems with the four/four custody arrangement when the child started school.
Also, in regard to the father's moving to Florence, there was testimony that the father committed to move in 2004 and again in 2005 and that he committed to *813 begin moving his business to Florence as well; the testimony would support the conclusion that the father could easily have moved his photography business to Florence. The father's most recent commitment was that he would move to Florence in the summer of 2006. It is undisputed, however, that the father did not follow through on his commitments to relocate to Florence. Instead, he threatened the mother that he would attempt to obtain primary physical custody instead of moving, even before the mother filed her petition in the Lauderdale Circuit Court seeking primary physical custody. Based on the tenor of the testimony concerning the father's commitments to move, other testimony, and the fact that the father filed a counterpetition seeking sole custody of the child shortly before the final hearing in the present case, the circuit court could have concluded that the father had no intention of moving or that he had failed to act in good faith regarding moving and that, in that regard, he had placed his own self-interest above the child's best interest.
The circuit court also could have concluded that, despite the father's testimony that he believed such things negatively affected the child, the father had instigated contentious conversations with the mother in the child's presence. Although the father attempted to blame the mother for these conversations, the circuit court could have concluded that the father was at fault. Likewise, the circuit court could have concluded generally that the father was being untruthful and evasive in his testimony and that he was attempting to mislead the court in an effort to obtain sole custody of the child.
In any event, based on the foregoing, and other testimonial and documentary evidence (including the testimony of the maternal grandmother), the circuit court implicitly concluded, after an ore tenus hearing, that a material change in circumstances had occurred since the entry of the September 2003 order and that it was in the best interest of the child for the mother to have primary physical custody. As discussed above, the task of an appellate court is not to reweigh the evidence, but to determine if there is sufficient evidence to support the trial court's ruling. Based on our review of the record, we must conclude that there was sufficient evidence in this regard and, therefore, that the Court of Civil Appeals erred in reversing the judgment of the circuit court.[8]

2. Application of Watters
In the present case, the Court of Civil Appeals relied on Watters for the proposition that the mother bore the "burden of showing that a material change of circumstances had occurred that affected the child's welfare since the last custody order. See, e.g., Watters v. Watters, 918 So.2d 913, 916-17 (Ala.Civ.App.2005)." Davis, 47 So.3d at 800. It went on, however, to state:
"The evidence shows that the only change that has occurred has been the *814 natural progression of the child to prekindergarten school. However, the mother has not demonstrated how this change, in the context of the joint-custody arrangement, has affected the child's welfare or best interest. The evidence shows that the child could attend prekindergarten part-time and that the father could instruct the child on the days she did not attend. The child thrived in a similar arrangement in day care. The mother presented no evidence to indicate that the child would not continue to thrive while in pre-kindergarten under the same arrangement. The only other relevant evidence the mother presented showed that the child expressed anxiety at exchanges and that she would miss school, church, and extracurricular activities if the current custody arrangement was maintained. However, as the father points out, even under the physical-custody arrangement approved by the Alabama trial court, the child would still experience exchanges and would still miss activities."
47 So.3d at 800-01.
We first note that the record before us is in conflict with the Court of Civil Appeals' conclusion that "the mother presented no evidence to indicate that the child would not continue to thrive while in prekindergarten under the same [four/four custody] arrangement." 47 So.3d at 801. The testimony presented, including that of the mother, Young, Carter, and Coleman, along with the inferences the circuit court was free to draw from the testimony, was more than adequate to call into question whether the child would "thrive" in the pre-K program if the four/four custody arrangement continued.
The Court of Civil Appeals also relied on the fact that the "only change" at issue involved what it termed a "natural progression of the child to prekindergarten school." 47 So.3d at 800. To the extent that this statement implies that a "natural progression" cannot be a material change in circumstances, it is at odds with the practical realities of life. By definition, a "progression" reflects a change from some prior state, in this case from the prior state of facts on which the Tennessee trial court based its judgment. The issue is whether the change is a material one, so far as the custody of the child is concerned, whether it is natural or not. To say that a change of custody cannot be based on the change in the child's needs simply because the change itself reflects a "natural progression" is to ignore the best interests of the child in favor of a more rigid, court-manufactured view, particularly, where, as in the present case, there is no indication that the "natural progression" was considered as part of the basis for the prior judgment.[9]

D. Conclusion
Based on the foregoing, the decision of the Court of Civil Appeals is due to be and is hereby reversed, and the cause is remanded to that court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
*815 COBB, C.J., and LYONS, STUART, SMITH, and SHAW, JJ., concur.
MURDOCK, J., concurs specially.
WOODALL, BOLIN, and PARKER, JJ., concur in the result.
MURDOCK, Justice (concurring specially).
I concur in the main opinion. I write separately to comment on the citation by the Court of Civil Appeals to Watters v. Watters, 918 So.2d 913 (Ala.Civ.App.2005), for the proposition that the mother had a "burden of showing that a material change of circumstances had occurred that affected the child's welfare since the last custody order" and of "demonstrat[ing] how this change ... has affected the child's welfare or best interest." Davis v. Blackstock, [Ms. 2060017, June 29, 2007] 47 So.3d 796, 800 (Ala.Civ.App.2007). See Watters, 918 So.2d at 916 ("the party seeking the modification of custody must prove `a material change of circumstances of the parties since the prior [judgment], which change of circumstances is such as to affect the welfare and best interest of the child or children involved'" (quoting Ponder v. Ponder, 50 Ala.App. 27, 30, 276 So.2d 613, 615 (Civ.App.1973))).
I find these articulations of the standard for modifying custody, including the above-cited articulation provided by Watters itself, to be potentially confusing and misleading. First, I note that it is not necessary to show a change of circumstances that has adversely affected the child's interests. As the opinion in Watters, itself, notes:
"Although some older custody cases indicated that an adverse impact on a child must be shown before a parent would be entitled to a change of custody, see, e.g., Lewis v. Douglass, 440 So.2d 1073 (Ala.Civ.App.1983), overruled by Ex parte McLendon, 455 So.2d [863,] 866 [ (Ala.1984) ], and Simpson v. Gibson, 420 So.2d 782 (Ala.Civ.App.1982), overruled by Ex parte McLendon, 455 So.2d at 866, our supreme court has, on more than one occasion, clearly stated that custody modifications do not require proof of a material change of circumstances that has adversely or detrimentally impacted the child. See Ex parte Murphy, 670 So.2d 51, 53 (Ala. 1995); Ex parte McLendon, 455 So.2d at 866; and Ford v. Ford, 293 Ala. 743, 744, 310 So.2d 234, 235 (1975) (correcting a statement of the law from an opinion of the Court of Civil Appeals regarding custody modifications by omitting the word `adversely'). Instead, the party seeking the modification of custody must prove `a material change of circumstances of the parties since the prior [judgment], which change of circumstances is such as to affect the welfare and best interest of the child or children involved.' Ponder v. Ponder, 50 Ala. App. 27, 30, 276 So.2d 613, 615 (Civ.App. 1973)."
918 So.2d at 916.
More generally, the standard as articulated in the opinion of the Court of Civil Appeals and in Watters suggests that the change of circumstances, itself, must have had an effect on the child's "welfare and best interest." I believe a clearer way to express the operative standard is to say simply that the party seeking the custody modification must show (1) a material change in circumstances since the prior judgment and (2) that a change of custody in response to that change in circumstances will be in the child's best interest.
NOTES
[1] The Court of Civil Appeals concluded that the Lauderdale Circuit Court's assumption of jurisdiction was consistent with the provisions of the Uniform Child Custody Jurisdiction and Enforcement Act, Ala.Code 1975, § 30-3B-101 et seq. This conclusion appears to be correct.
[2] At trial, the mother clarified that the child would have been required to attend every day in the pre-K program in which the mother had initially considered enrolling the child. By the time of trial, however, the parties had agreed for the child to attend a pre-K program that did not require daily attendance as a condition to enrollment.
[3] The circuit court's "standard visitation" included visitation every other weekend, four weeks during the summer (two weeks in June and two weeks in July), several days during spring break and fall break from school, and various holidays, and other visitation to which the parties might agree.
[4] The mother remarried at some time after the custody proceedings in Tennessee. She did not suggest at trial in the present case, however, that her remarriage was one of the material changes of circumstance that might support a change of custody.
[5] The parties apparently had considerable difficulty cooperating, each blaming the other for those problems. The circuit court obviously may have resolved that issue in favor of the mother. In any event, one of the factors relevant to a joint-custody award is "[t]he past and present ability of the parents to cooperate with each other and make decisions jointly." Ala.Code 1975, § 30-3-152. Where such cooperation is lacking and the child's welfare is implicated, a joint-custody award may not be, or may no longer be, appropriate.
[6] The father argued to the Court of Civil Appeals that the circuit court erred as to the admissibility of certain testimony from Robert D. Young and Myra Carter, see discussion infra, and to the admission of office notes from a counselor who had counseled the parties pursuant to an order of the Tennessee Chancery Court. We have carefully reviewed the record, including the father's objections where an objection was actually made, and we cannot conclude that the circuit court improperly considered any of the evidence that was presented at trial.
[7] We recognize that the child will still experience changes of custody under the primary-custody/visitation arrangement ordered by the circuit court. Based on the evidence seen and heard, however, the circuit court could have concluded that a change to primary physical custody being with the mother, with visitation as ordered for the father, would help alleviate, at least to some degree, problems that had developed with the four/four custody arrangement.
[8] As discussed in Headrick v. Headrick, 916 So.2d 610, 615 (Ala.Civ.App.2005), alternating-custody arrangements can be disruptive to a child if the parents do not live in the same community. See also Ala.Code 1975, § 30-3-152 (factors relevant to a joint-custody award include "[t]he geographic proximity of the parents to each other as this relates to the practical considerations of joint physical custody"); see also Poe v. Capps, 599 So.2d 623, 624-25 (Ala.Civ.App.1992) (concluding that an alternating annual-custody arrangement "was workable and satisfactory with the parents and the child until the child became old enough to enter school.... The father's petition to modify that unique custody arrangement appears to be a step towards providing academic stability for the child by having the issue of custody finally adjudicated").
[9] Indeed, the converse is true here. As noted, the Tennessee Court of Appeals, in affirming the judgment of the trial court that fashioned the preexisting four/four custody arrangement, stated in its opinion:

"Shuttling [the child] back and forth every four days will no longer be in her best interests when she begins school. [The mother] insists that these potential difficulties provide a sufficient basis to vacate the revised residential schedule and to designate her as the primary residential parent. We respectfully disagree. Courts must base their decisions on the evidence of what has already happened, not on speculation about what might happen in the future."
(Emphasis added.)