On Application for Rehearing

PITTMAN, Judge.
This court’s opinion of January 18, 2013, is withdrawn, and the following is substituted therefor.
J.D.H. (“the husband”) appeals from a judgment of the Winston Circuit Court divorcing him from A.M.H. (“the wife”), awarding custody of the parties’ two minor children, dividing the marital assets, and awarding the wife an attorney fee. We affirm in part, reverse in part, and remand with instructions.
The parties married in March 2005. The wife, then a 17-year-old high-school senior, was pregnant with the husband’s child, and the husband, then a 23-year-old high-school graduate, was employed as a real-estate agent. Soon after the marriage, the wife experienced a miscarriage, graduated from high school, and embarked on an elementary-education curriculum at a nearby university. At some point during the marriage the husband was employed by a company owned by his father, but he left that employment in 2007 and returned to the real-estate field. The husband insisted on paying the wife’s college expenses, despite her stating that she had been offered scholarships in high school and could probably obtain a scholarship to the university she was attending.
Initially, the parties lived in a small house owned by the husband. In June 2006, the husband’s parents deeded the parties a four-acre parcel of land near the parents’ home in Double Springs, and the parties built a 4-bedroom, 4,000-square-foot house on the parcel. The wife gave birth to two children: a son, born in August 2007, and a daughter, born in December 2008.
On July 5, 2009, the wife left the marital residence with the two children and went to a domestic-abuse shelter. Four days later, she filed a complaint alleging that the husband had committed acts of physical violence on her and seeking a divorce and pendente lite custody of the children, as well as child support, spousal support, and the use of the marital residence. The husband answered and counterclaimed, seeking a divorce and pendente lite custody of the children on the ground that the wife was exhibiting erratic behavior that threatened the safety of the children. On July 29, 2009, the trial court entered an ex parte order granting the husband immediate temporary custody of the children and stating that it would set the matter for a hearing at the request of either party. Two days later, in response to a motion by the wife, the trial court withdrew its July 29 order and set the pendente lite issues for a hearing. Following that hearing, the trial court entered a pendente lite order on August 17, 2009, granting the parties joint legal custody, the wife sole physical custody, and the husband alternating weekend visitation with the children. The husband was ordered to pay $135 per week in pen-dente lite child support and to maintain health-insurance coverage for the wife and children.
On December 7, 2009, the husband moved to modify the pendente lite order, *982 alleging (a) that he had just graduated from the Sheriffs Academy, that he had begun employment as a sheriffs deputy, and that his work schedule did not permit him to exercise alternating weekend visitation; and (b) that the wife had relocated the children from Marion County, where she had been living in her deceased grandmother’s house, to Cullman County, where she was cohabiting with a paramour.
At the time of the January 13, 2010, hearing on the husband’s motion to modify, the husband had resigned his position as a sheriffs deputy. He explained that the sheriff had advised him that he was not suited to “just serving papers” and would probably be happier if he sought employment with a municipality where he could have a more active law-enforcement role. The husband had taken a job at a realty company, where he was working on a commission basis; he had not yet earned any commissions. The wife was a student-teacher in college and expected to graduate in May 2010. The wife acknowledged that, in late August 2009, she had met D.H., a recently divorced man, and had moved into his home after having known him only a few weeks. She stated that on weekday mornings she typically took the parties’ son to a day-care center at 6:45 a.m. and then drove 45 minutes to another city, where her student-teaching post was located and where she left the parties’ daughter at the home of a babysitter who was D.H.’s 22-year-old niece. The wife also acknowledged that she had not informed the husband of her and the children’s whereabouts when she had moved.
Following the hearing, the trial court entered an amended pendente lite order, awarding the parties joint physical custody of the children, rotating weekly, with each party bearing the responsibility to support the children during his or her custodial period. That arrangement continued for the next 15 months. A final hearing was held over four days — March 11 and 25 and April 6 and 26, 2011.
By the time the trial began in March 2011, the wife had completed her degree requirements and was employed as a science teacher at a middle school where she also served as a girls’ basketball coach and assistant softball coach. She had moved out of D.H.’s house and was living in her deceased grandmother’s house in Haley-ville. The husband was again employed as a law-enforcement officer, this time as a patrol officer for a nearby municipality where he worked 12-hour shifts 3 times a week and earned $13.50 per hour. Both parties depended upon the children’s retired grandparents (the wife relying on her father, the husband on his mother and, to a lesser extent, his father) to assist with child care. Before the April 2012 hearings, the husband had resigned his law-enforcement position and had gone to work in another of his father’s three business enterprises so that, he said, he could have a more flexible schedule and be able to pick up the children at their preschools and spend more time with them in the afternoons.
The husband testified that, before the parties separated, the wife had committed adultery with at least three men, including one of her former high-school teachers. The husband presented evidence demonstrating that, during the two years that the case was pending, the wife had moved five times and had cohabited with two different men. The wife denied the husband’s accusation of pre-separation adultery and stated that she had not had sexual relations with anyone but the husband before she had filed the complaint for a divorce. She described the husband as a person who alternates between being charming and being controlling, and as being possessive, *983 jealous, insecure, and prone to “raging fits.”
The wife testified that she had seen the husband’s first “raging fit” six months after the parties were married. The wife was packing in preparation for the parties’ move to their newly constructed house in Double Springs when the husband came home very angry. He began throwing things, kicking furniture, punching walls, and breaking pictures. The wife was frightened, and she telephoned the husband’s parents, who soon arrived with a bag containing pills; they instructed the wife to see that the husband swallowed a pill. As the husband took the pill, he told the wife: “If you want to, divorce me now. I have to take this to keep me calm.” After that episode, the wife said, the husband had been very apologetic: he had bought her a dozen roses the following day and a Cadillac CTS automobile the following week. The -wife stated that, before the incident, she had not known that the husband had been taking any medication but that she had learned later that the pills were escitalopram (an anti-anxiety drug) and lamotrigine (an anti-seizure drug prescribed for bipolar disorder). The wife obtained a list of the husband’s prescriptions from the pharmacist and discovered that the husband had also been prescribed human growth hormone (“HGH”) and testosterone, and, she said, she had seen the husband inject HGH. The husband stated that he had been diagnosed with low testosterone, and he admitted that he had taken that hormone supplement, but he denied that he had been prescribed, or that he had taken, HGH.
The wife stated that the husband’s parents had seen the husband’s violent temper during a three-week period when the parties had lived with the husband’s parents after a fire had damaged the marital residence. According to the wife, the husband’s temper was so out of control during that time that his parents had asked the parties to live elsewhere until they could return to the marital residence.
The wife testified that the husband had screamed and cursed when the children had cried or had had dirty diapers; she said he would “get in the children’s faces” and yell: “Shut the f_up” or “stop the G_d_crying.” In addition, the wife said that the husband had taken a knife and cut the son’s baby-dedication outfit (an outfit that the son had worn to church and that, the wife said, the husband did not like because it was not masculine enough) because, he thought, it was too tight and was choking the child. The husband took issue with the wife’s account of the incident, stating that he was trying to clean the child after a bowel movement and had used a knife to cut the garment away because he could not unfasten the buttons.
The wife stated that the husband’s rages had gradually become more frequent and more violent, and she had become more frightened of the husband. She stated:
“I’m a very small person. He’s very big, obviously. He lifts weights all the time. He would jerk me up by my wrists. He’d drag me all over the house. If I wouldn’t consent to what he was wanting to do — he wanted me to be this [sex] freak, so called — he’d grab me up by the throat. The sexual incidents got ... horrible, and I did not want to have sex at all because it was so painful.”
Describing the incident that caused her to leave the marital residence in July 2009 to seek refuge in a domestic-abuse shelter, the wife stated that the husband had become enraged because an Internet video he was watching was not streaming fast enough. She said the husband had picked up a chair and had rammed it on the tile floor, causing the chair to break and send *984 ing a wood shard skimming over the son’s head. When the wife picked up the son and took him to another room, the husband stormed outside and repeatedly slammed the broken chair against the gas grill; the husband then came back inside, grabbed a picture, and threw it against the wall, causing glass to shatter all over the room. The husband acknowledged that he had become angry on that occasion, but, he said, his anger had been precipitated by his discovery that the wife had sent an instant message to an old boyfriend, one of the three men with whom, the husband thought, the wife had been unfaithful.
The husband’s mother, who has a master’s degree in elementary education and retired after teaching for 25 years, testified that the husband had no “anger issues.” The husband’s father, a retired educator and football coach, acknowledged that, during the parties’ marriage, the wife had confided in him about the husband’s being “high-tempered.” The husband’s father also said that he had expressed to the wife his concern about the husband’s “getting off [his medication].”
Much of the testimony at trial centered on the issue whether the wife had acknowledged and had been willing to seek the appropriate assistance for the son’s special needs. The wife testified that she had been concerned that the son’s speech was not developing normally because, she said, at 18 months of age the son had suddenly stopped talking. Whereas the son had previously been putting words together in short phrases, he began to speak, if at all, only single words and seemed to want to play alone. The wife attributed the child’s cessation of normal speech to his having witnessed the husband’s rage and abuse. The husband’s mother had taken the son to a certified registered-nurse practitioner, who had determined that the son was autistic. Later, the wife sought a second opinion from a pediatrician, who referred the wife to a psychologist. After testing the child, the psychologist concluded that the son had a pervasive developmental disorder (“PDD”) and recommended speech therapy. The wife stated her understanding that PDD was “on the autism spectrum” but was a less severe disability than full-blown autism. She said that the son was receiving speech therapy once per week in his preschool through a state program known as “early-intervention services.”
The husband and his mother presented testimony and documentary evidence indicating that the son was not receiving the level and consistency of early-intervention services that he needed, either because the wife had moved and had changed day-care providers and preschools so often or because the wife was “in denial” about the severity of the son’s disability.
The husband also presented evidence indicating that, at best, the wife had used poor judgment in her choice of male companions and, at worst, had been unwilling to put the best interests of her children above her own desires. The wife acknowledged at trial on March 25, 2011, that she was currently dating D.R., a man who lived in Shelby County and who sometimes spent the night with her when the children were there. She stated that D.R. had revealed to her that he had been charged with a domestic-violence offense arising out of an altercation with his brother but that the charge had been dismissed. On cross-examination, the wife admitted that she had also known that D.R. had two driving-under-the-influence convictions, but she had been unaware that D.R.’s driver’s license had been suspended. When confronted with that information, she stated that she would not allow her children to be in a car driven by D.R. When asked whether she would continue her relation *985 ship with D.R. if the trial court awarded custody of the children to her, she said: “I don’t know.”
On May 23, 2011, the trial court entered a judgment divorcing the parties on the ground of incompatibility of temperament; awarding the parties joint legal, and the wife sole physical, custody of the children; granting the husband standard visitation rights; ordering the husband to pay child support of $166 per week; awarding the wife a $25,000 lump-sum property settlement and dividing the parties’ personal property; and awarding the wife a $5,300 attorney fee. The husband filed a post-judgment motion that was denied, following a hearing, on August 24, 2011. The husband timely appealed on September 30, 2011, raising three issues: that the evidence did not support the trial court’s custody determination; that the evidence did not support the $25,000 lump-sum property award to the wife; and that the trial court acted outside the limits of its discretion in awarding the wife a $5,300 attorney fee.
I.
“Because this was an initial custody determination, where the parties are on equal footing and the trial court must base its decision on what it determines would be in the best interest of the child, our review is very limited.” Headrick v. Headrick, 845 So.2d 823, 825 (Ala.Civ.App.2002) (citation omitted).
“When [an appellate court] reviews a trial court’s child-custody determination that was based upon evidence presented ore tenus, [it] presume[s] the trial court’s decision is correct: ‘ “A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong....’” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. ‘In child custody cases especially, the perception of an attentive trial judge is of great importance.’ Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981). In regard to custody determinations, [our supreme court] has also stated: ‘It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.’ Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).”
Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
The evidence in this case was highly disputed. The undisputed evidence, however, indicates that neither party was a model parent. Under the circumstances, it was the province of the trial court to observe the witnesses, to sift the evidence, and to determine which parent would better serve the best interests of the children. Because the trial court determined that issue in favor of the wife without setting out specific findings, we must assume that the trial court made “ ‘those findings necessary to support its judgment, unless such findings would be clearly erroneous.’ ” Ex parte Fann, 810 So.2d at 633 (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996)). The trial court was presented with evidence from which it reasonably could have found that the husband had a volatile temper and an overly ag *986 gressive temperament that accounted for his frequent changes in employment and his repeated returns to employment at one of his father’s companies. The trial court was also presented with evidence from which it reasonably could have determined that the wife, who had been the children’s primary caretaker, had dealt with challenges in a more patient, resourceful, and effective manner than the husband. After the parties’ separation, the wife obtained a Pell grant to continue her education, graduated from college on time, was successful in finding a teaching job in the area, and remained continuously employed. The wife’s numerous moves were necessitated, to some extent, by the location of her student-teaching assignment and the availability of summer jobs after college graduation. With respect to her two paramours, the wife candidly described her dating criterion as follows: whether a man is “good to me and good to my kids.” There was no evidence to indicate that either paramour had not met that criterion.
Although the evidence supported the conclusion that the wife was less diligent than the husband and his mother about ensuring that the son received all available services for his disability, the trial court’s judgment appropriately provided:
“[T]he [wife] shall use all due diligence in investigating the learning disability/developmental delay/autism of the male child. She shall consult directly with the [husband’s mother] on this issue and the [husband’s mother] shall have the right to attend any and all visits to health-care providers related to this issue.”
In sum, we cannot say that the trial court’s custody award was unsupported by the evidence so as to be plainly and palpably wrong.
II.
The husband argues that the trial court erred in awarding the wife a lump-sum property settlement of $25,000 because, he says, the court made no factual finding as to what that sum represented or how it was calculated, and there was no evidence indicating that the husband had assets from which to pay the award. The wife argues that the $25,000 award represented approximately half the parties’ equity in the marital residence. In order to understand the parties’ arguments, it is necessary to outline the sequence of events with respect to the marital residence.
In June 2006, the husband’s parents conveyed a four-acre parcel of undeveloped land to the parties, after which the parties obtained a construction loan in the amount of $202,490.75 from a local bank, executed a note and mortgage to the bank, and built the marital residence. The parties began to experience financial problems as the real-estate market declined and the husband’s real-estate commissions dwindled. In June 2007, when they could no longer make their mortgage payments to the bank, the parties sold the property for $215,000 to a limited-liability company (“LLC”) owned by the husband’s father and used those funds to satisfy the mortgage indebtedness to the bank.[1] In November 2008, when the real-estate market collapsed, the LLC reconveyed the property to the parties. The husband’s father testified that he had expected to be repaid $215,000 for the LLC’s 2007 purchase of *987 the property, but, he said, the parties had qualified for a loan of only $151,956. On November 21, 2008, the parties executed a note and mortgage in that amount to the bank and paid the loan proceeds to the husband’s father, who made all the mortgage payments until June 2010, after which he made no further payments. In January 2011, the bank foreclosed on the mortgage and the husband’s father purchased the property at the foreclosure sale for $151,961.[2] The husband’s father allowed the husband to live in the former marital residence, but he did not reconvey the property to the husband. The husband’s father testified that he was saving the property for the parties’ children.
The wife argues that the parties’ equity in the marital residence was approximately $50,000 — the difference between $202,490.75 (which amount, the wife says, was the value of the marital residence as determined by the parties’ original construction loan that was paid off in full in 2007) and $151,961 (the price paid by the husband’s father at the foreclosure sale in 2011). She asserts that she was entitled to half of that “equity” because the husband still lives in the house. The wife’s argument is incorrect, because, at the time of the entry of the divorce judgment on May 23, 2011, the parties had no equity in the property — only a statutory right of redemption, see § 6-5-248, Ala.Code 1975. See also § 6-5-250, Ala.Code 1975, which provides:
“The statutory rights of redemption given or conferred by this article are mere personal privileges and not property or property rights. The privileges must be exercised in the mode and manner prescribed by statute and may not be waived in a deed of trust, judgment, or mortgage, or in any agreement before foreclosure or execution sale. The right o[r] privilege conferred under this article is not subject to levy and sale under execution or attachment nor is it subject to alienation except in the cases provided for in this article; but if the right or privilege is perfected by redemption as provided in this article, then, and not until then, it becomes property or rights of property subject to levy, sale, alienation, or other disposition, except as is expressly authorized by statute.”[3]
If, as the wife contends, the trial court intended its $25,000 lump-sum award to represent the wife’s share of perceived “equity” in the marital residence or any other “property right” therein, the award was erroneous as a matter of law. If the trial court intended its lump-sum award to represent the wife’s equitable share of any other marital asset, then the award is unsupported by any evidence. The parties agreed upon a division of most of their personal property — vehicles, furniture, furnishings, and equipment. The trial court divided the property about which they could not agree. The evidence does not disclose any marital asset worth at least $25,000 from which a lump-sum award to the wife could have been derived.
III.
The husband maintains that the trial court acted outside the limits of its discretion in ordering him to pay the wife an attorney fee of $5,300.
“It is without question that the trial court has wide discretion in awarding attorney fees to parties in a divorce *988 proceeding. Hansen v. Hansen, 401 So.2d 105, 107 (Ala.Civ.App.1981).
“ ‘Whether to award an attorney fee in a domestic relations case is within the sound discretion of the trial court and, absent an abuse of that discretion, its ruling on that question will not be reversed. Thompson v. Thompson, 650 So.2d 928 (Ala.Civ.App.1994). “Factors to be considered by the trial court when awarding such fees include the financial circumstances of the parties, the parties’ conduct, the results of the litigation, and, where appropriate, the trial court’s knowledge and experience as to the value of the services performed by the attorney.” Figures v. Figures, 624 So.2d 188, 191 (Ala.Civ.App.1993). Additionally, a trial court is presumed to have knowledge from which it may set a reasonable attorney fee even when there is no evidence as to the reasonableness of the attorney fee. Taylor v. Taylor, 486 So.2d 1294 (Ala.Civ.App.1986).’ ”
Martin v. Martin, 85 So.3d 414, 423 (Ala.Civ.App.2011) (quoting Glover v. Glover, 678 So.2d 174, 176 (Ala.Civ.App.1996)).
This divorce litigation was protracted and contentious, but, unlike in Brasfield v. Brasfield, 679 So.2d 1091, 1095 (Ala.Civ.App.1996) (trial court acted within its discretion in awarding a $100,000 attorney fee in protracted and contentious divorce litigation involving assets exceeding $2.3 million), the parties had few marital assets. The husband insists that the wife’s financial circumstances are better than his, as evidenced, he says, by the facts that her gross monthly income is $3,156 and his is only $2,340 and that the wife decided to have elective breast-augmentation surgery costing $2,900 the week before the March 25, 2011, trial date. The husband also insists, as he argued in his postjudgment motion, that the trial court’s judgment failed to acknowledge or to credit him with endorsing and handing over to the wife at trial an insurance-refund check in the amount of $2,298.[4]
During the parties’ separation, the husband lived rent-free, paying only the utility bills on the former marital residence owned by his father. During most of that time, when the wife lived in her deceased grandmother’s house in Marion County and with a paramour in Cullman County, she also paid no housing expense other than utilities. Several months before the April 26, 2011, trial date, the wife moved into an apartment in Jasper; however, she provided no evidence as to her monthly rental expense at that location. The trial court could properly have inferred that the husband would probably continue to live rent-free in his father’s house, while the wife would probably continue to incur a housing expense.
As previously stated, the divorce judgment includes no specific findings of fact, but, because the trial court divorced the parties on the ground of incompatibility and awarded the wife sole physical custody of the children and a lump-sum property settlement, we assume that the trial court found the husband’s testimony that the wife had committed adultery with three men before the parties’ separation unworthy of belief and determined, instead, that the husband’s volatile and aggressive temperament was primarily responsible for the breakup of the marriage.
Accordingly, we cannot find that the trial court acted outside the limits of its discretion in awarding the wife an attorney fee. That said, the husband’s argument that he had not been credited with delivering to the wife the insurance-refund check *989 in the amount of $2,298 is well-taken, and we instruct the trial court, on remand, to credit the husband with that amount, thus making the sum due to the wife for payment of her attorney fee $3,002.

Conclusion

That portion of the divorce judgment awarding the wife sole physical custody of the children is affirmed. That portion of the judgment awarding the wife a lump-sum property settlement of $25,000 is reversed. The attorney-fee award is affirmed, but the trial court is instructed to credit the husband with $2,298 toward the payment of that fee. The cause is remanded for the entry of a judgment consistent with this opinion.
APPLICATION OVERRULED; OPINION OF JANUARY 18, 2013; WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and THOMAS and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.

. The wife testified that she had not known that the parties' mortgage payments had not been made. She said the husband had told her only that “they" had "paid off the mortgage” when, in fact, the parties had conveyed the property to the LLC and the LLC, acting through the husband’s father, had paid off the mortgage note. The wife stated that she realized that she had been "hoodooed the whole marriage."

. The evidence was undisputed that the wife had notice of the foreclosure proceedings.

. Section 6-5-248(b), Ala.Code 1975, provides that an individual whose real property is sold at a foreclosure sale by virtue of the foreclosure of a mortgage thereon “may exercise the right of redemption ... within one year from the date of the [foreclosure] sale.”

. The evidence established that the check represented a return premium for force-placed insurance on the marital residence during the pendency of the foreclosure proceedings.