PER CURIAM.
Mark D. Davis (“the father”) and Tonya Blackstock (“the mother”) have appeared before the appellate courts of this state on numerous previous occasions. For a thorough discussion of the history of the parties’ litigation, see Davis v. Blackstock, 47 So.3d 796 (Ala.Civ.App.2007) (“Davis I”); Ex parte Blackstock, 47 So.3d 801 (Ala.2009); Davis v. Blackstock, 47 So.3d 816 (Ala.Civ.App.2010) (“Davis II ”); Ex parte Davis, 82 So.3d 695 (Ala.Civ.App.2011); Davis v. Blackstock, 159 So.3d 708 (Ala.Civ.App.2013) (“Davis III”); Davis v. Blackstock (No. 2120112, April 5, 2013), 161 So.3d 308 (Ala.Civ.App.2013) (table); and Davis v. Blackstock, 159 So.3d at 728 (Ala.Civ.App.2013) (opinion on return to remand) (“Davis IV”).
In Davis I, the father appealed a September 1, 2006, judgment that modified custody of the parties’ minor child to award the mother primary physical custody of the child and ordered the father to pay child support. This court reversed on the custody issue. Davis I, supra. Our supreme court reversed that decision, holding that the trial court had not erred in awarding the mother primary physical custody of the child, and it remanded the matter to this court. Ex parte Blackstock, supra. On remand, this court affirmed the custody modification but determined that the trial court had made an error in determining the father’s child-support obligation; accordingly, this court reversed the child-support award and remanded the case for the child-support award to be recalculated. Davis II, supra.
On remand from Davis II, the father asserted a number of jurisdictional challenges to the trial court’s subject-matter jurisdiction to enter the September 1, 2006, custody-modification judgment that had been reviewed in Davis I, Ex parte Blackstock, and Davis II, and, on November 10, 2010, he moved for a modification of custody of the child. The trial court denied the father’s jurisdictional challenges, and the father petitioned for a writ of mandamus. This court denied the petition for a writ of mandamus, determining that the trial court had properly exercised its jurisdiction. Ex parte Davis, supra.
On July 9, 2012, the trial court conducted an ore tenus hearing, purportedly to calculate child support in compliance with this court’s holding in Davis II; it also received evidence on, among other issues, the father’s pending claim seeking a modification of custody. On August 3, 2012, the trial court entered an order setting child support. The trial judge also re-cused himself at that time. In November 2012, during the hearing on the father’s purported postjudgment motion, the father withdrew his pending custody-modification claim. The new trial judge entered a final judgment in the matter, and the father timely appealed. Davis III, supra.
In Davis III, this court held, among other things, that the trial court had failed to comply with the mandate in Davis II in determining the father’s child-support obligation. Therefore, this court reversed the judgment and remanded the case for the entry of a corrected child-support award within 60 days of the date of our opinion in Davis III.
On remand from Davis III and in compliance with this court’s directions in Davis II, the trial court entered a judgment on April 29, 2013, in which it recalculated the father’s child-support obligation *313 to be $506 per month. In addition, the trial court found the father’s child-support arrearage to be $85,519.37, and it denied the father certain credits he had sought against that arrearage. On return to remand, this court allowed the parties to submit amended briefs regarding that new, April 29, 2013, judgment. This court then affirmed the April 29, 2013, judgment. Davis TV, supra. Our supreme court denied the father’s petition for a writ of certiorari from this court’s decision in Davis TV on September 13, 2013.
The father initiated the current custody-modification action in the trial court on July 30, 2012, and the action proceeded in that court while Davis III and Davis TV were pending in the appellate courts. In his July 30, 2012, modification complaint, the father sought an award of custody of the child and an order placing restrictions on any visitation awarded the mother based on allegations that the mother was exposing the child to “unsuitable and/or immoral behaviors.” The father later amended his complaint to allege, among other things, that the mother was not properly addressing the child’s medical conditions. In his July 30, 2012, modification petition, the father also persisted in his arguments that the September 1, 2006, judgment was void for want of jurisdiction.
Also on July 30, 2012, the same date on which he filed his custody-modification petition, the father filed an ex parte motion for a temporary restraining order. In that motion, the father alleged that the mother sometimes left the child with the mother’s sister, Tina Smith (hereinafter “the aunt” or “Tina”), and Tifanie Reaves (“Tifanie”), the woman with whom the aunt is engaged in a relationship. In his July 30, 2012, ex parte motion for a temporary restraining order, the father also alleged that the aunt had a vicious dog, a dachshund, that had bitten the child in June 2010. The father sought an order preventing the mother from allowing the child to be exposed to the aunt and/or the dog.
The mother answered the father’s July 30, 2012, modification petition and sought an award of an attorney fee, citing the continual litigation between the parties. The mother also counterclaimed, seeking to have the father held in contempt for his continued failure to pay child support and requesting the award of an attorney fee with regard to that claim.
On October 22, 2012, the father filed a motion for a preliminary injunction, reiterating the same allegations he had asserted in requesting a temporary restraining order. On October 25, 2012, the trial court entered an order denying the father’s motion for a preliminary injunction. The father appealed, and this court affirmed without an opinion. Davis v. Blackstock, (No. 2120112, April 5, 2013), 161 So.3d 308 (Ala.Civ.App.2013) (table).
The trial court conducted an ore tenus hearing on July 22, 2013, and August 26, 2013. At the beginning of that hearing, the mother moved to-dismiss her counterclaim seeking to have the father held in contempt for his failure to pay child support as ordered; in doing so, the mother referred to a separate action initiated by the State of Alabama seeking the same relief, and she represented that she would assert her contempt claim in that separate action. However, the mother renewed her request for the award of an attorney fee in response to the father’s custody-modification claim, citing the “protracted litigation we have had.” The trial court orally granted the mother’s motion to dismiss her contempt claim, and it later reiterated that ruling in writing in its final judgment.
On August 29, 2013, the trial court entered a judgment in which it, among other things, denied the father’s modification petition and awarded the mother an attorney *314 fee in the amount of $3,959.49. The father filed a postjudgment motion, which the trial court denied. The father timely appealed.
The evidence in the record on appeal indicates the following pertinent facts. The father testified that in August 2010 the parties’ child, who was then eight years old, contacted him by telephone to inform him that she was upset that the mother’s boyfriend had spent the night at the mother’s home. According to the father, the child also told him that she had seen her mother kissing the boyfriend when the mother was only partially clothed. The father testified that the daughter cited Biblical teachings as part of the concerns she expressed to him.
The father testified that, after that August 2010 conversation with the child, he immediately attempted to contact the mother by telephone but that she did not answer. The father then contacted the mother’s mother (“the maternal grandmother”) and informed her of the content of his conversation with the child, and he asked the maternal grandmother to. check on the child. The father also informed the maternal grandmother that he had made an audio recording of his August 2010 conversation with the child. The maternal grandmother testified that she went to the mother’s home to discuss the incident with the child and that she informed the child about the audio recording in order to ensure that the child was being truthful with her. The maternal grandmother and the father each testified that the child had been extremely upset that the father had recorded his conversation with her and that the child telephoned the father to demand that the father delete the recording. The father testified that he had erased the recording after the child became upset and asked him to do so.
The mother denied that the child had witnessed her kissing the boyfriend when she was only partially dressed. The mother testified that the boyfriend was napping and that she was changing clothes when the child entered her room. The mother testified that, since 2010, her boyfriend has not stayed overnight in her home. The father agreed with that assertion; however, he alleged that the mother and her boyfriend sometimes went out of town together, that the parties’ child “knows that [it] is wrong” for the mother to engage in sexual relations outside of marriage, and that the mother’s relationship with her boyfriend upsets the child.
The father also testified that in July 2010 the child had been bitten by a small dog, a dachshund, owned by the mother’s sister, Tina. The father testified that the mother had informed him that Tina had “gotten rid of’ the dog that had bitten the child. However, the father testified that, in preparing for the hearing in this matter, he had discovered photographs on the child’s iPod electronic-media device of two dachshunds owned by Tina that, he said, were taken a few weeks before the final hearing; the father testified that those photographs had been taken during a trip that summer. The father submitted the photographs of the two dogs into evidence, stating that he was unable to identify which of the two was the “vicious one.” The father admitted that he had no evidence indicating that either of the dogs was the one that had bitten the child in 2010. The mother testified that neither of the dogs in the photographs the father obtained from the child’s iPod was the one that had bitten the child in 2010 and that Tina had “gotten rid of’ the dog that had bitten the child.
The father also based his custody-modification claim on his assertion that the mother was wrong in allowing Tina to *315 spend time with the child and to take care of the child after school. The father presented evidence indicating that Tina is in a homosexual relationship with Tifanie. The father objected to the child’s being exposed to the relationship between Tina and Tifanie on the basis that the relationship is against Biblical teachings. The father stated that the mother “laughed off’ his concerns.
The father questioned the mother about whether she was aware of whether Tina or Tifanie has a mental disorder or whether they drink alcohol, and the mother answered in the negative. The mother testified that nobody consumes alcohol around the child, unless it occurs at the father’s home. The father submitted into evidence arrest records from Tennessee indicating that, in 2009, Tifanie had been arrested for driving under the influence and leaving the scene of an accident, and the mother stated that she had not been aware of those arrests. The record contains no evidence regarding whether Tifanie has ever driven a vehicle in which the child ,was riding.
The father alleged that the child had told him that she accesses Tifanie’s social-media page and that he objected to photographs of Tifanie that he saw on that page. Several photographs from Tifanie’s social-media page were admitted into evidence; the trial court sustained objections to the father’s attempts to testify regarding the content of that page.
Approximately two months before the hearing in this matter, Tina and Tifanie moved approximately an hour away from the mother’s home. It is undisputed that the child spent several days visiting Tina during the summer of 2013, shortly before the second day of the hearing in this matter. The mother testified that she had no concerns about thé child’s safety or the care she received when the child was in Tina’s care.
The maternal grandmother and the mother’s stepfather each testified that the mother was a good parent and that she or he had no concerns about the child when she was with Tina. We note that the mother, the stepfather, and the maternal grandmother each acknowledged that Tina and Tifanie live together and sleep in the same room, but they denied knowing the specifics of the relationship, i.e., whether it was sexual. The father questioned both the stepfather and the maternal grandmother regarding their opinions on the morality of homosexual relationships. The stepfather responded that he believed homosexuality was a sin, and he listed other sins, including the failure to provide for one’s family. The father also questioned the mother and employees at the mother’s church concerning their views on homosexuality and whether those witnesses believed homosexuality was a sin. The two witnesses from the mother’s church had little to no knowledge of the specific facts of this case.
The mother’s stepfather and the maternal grandmother also testified that the maternal grandmother had provided a great deal of monetary support for the child during her life. The mother’s stepfather agreed with a question from the mother’s attorney that he and the maternal grandmother had made contributions to the child’s support because the father had failed to pay child support for the child since 2008. It is also clear that Tina has contributed regularly to the child’s support when the father failed to do so; in a previous appeal, the father argued that Tina’s contributions to the child’s support should be included in determining the parties’ respective child-support obligations under the Rule 32, Ala. R. Jud. Admin., child-support guidelines. See Davis III, 159 So.3d at 727 at n. 10.
As part of his arguments pertaining to the mother’s allowing the child to be cared *316 for after school by Tina and Tifanie, the father testified that he has consistently asked the mother that, if the child was not going to be with the mother because the mother was working, he be allowed to take care of the child after school. The father testified that, as a photographer, his schedule is flexible and that he often worked from home; the father explained that he adjusted photographs and managed his business from his home computer. The father stated that, because of his schedule, he was available to take care of the child after school. The father estimated that he works approximately 60 to 70 hours per week, and he admitted that he sometimes traveled out of town or out of the state to take pictures.
According to the mother, the father had refused to establish a schedule by which he would pick up the child from school or from day care. The mother testified that, although the father was free to pick up the child after school, he had done so only occasionally. The mother also testified that she had asked the father to pick up the child on several occasions but that he had been unable to do so. The mother stated that Tina had also sometimes been unavailable to care for the child after school while the mother worked. For that reason, i.e., because she needed consistently reliable child care, the mother enrolled the child in an after-school or day-care program.
The parties also presented evidence pertaining to one occasion when the father had picked up the child from day care and had sent the mother a text message informing her that he had done so shortly afterward. The mother testified that the father had not notified her before picking up the child and that she had been terrified that he had kidnapped the child.[1] The mother stated that she generally had no objection to the father’s picking up the child in the afternoon but that she believed that he should notify her before doing so. The mother stated that she believed that the father has picked up the child from day care or school without telling her in advance because he knows it bothers her and that, in her opinion, he does it to “spite” her.
The father also cited the child’s weight gain as an additional basis for a custody modification. The father testified that the child had gained a significant amount of weight since 2010 and that the mother had failed to adequately address the problem. The father testified that the child had recently been diagnosed as being obese and that she had asthma. It is undisputed that the child has suffered from allergies, and the father maintained that the mother had failed to properly treat the allergies, which he implied caused the child’s asthma. The father presented no evidence indicating that the mother’s alleged failure to adequately treat the child’s allergies caused the child’s asthma, and the child’s pediatrician testified that there was no such link. The mother disputed the father’s testimony that she had not properly treated the child’s allergies. The mother also testified that the child plays an extracurricular sport, that she and the child exercise regularly together, and that the child had recently lost a few pounds.
The father alleged that he believed that stress, which he alleged was caused by the mother, might have contributed to the child’s weight gain. The father denied that he had contributed at all to the child’s stress. The father testified that, when he *317 attempts to talk to the mother about his objections to her conduct, the mother speaks to the child about the issues, which, he says, causes the child stress. The father testified that, in preparing for the current litigation, he discovered songs with what he considered to be inappropriate language and lyrics on a mobile telephone the mother had given the child. The father expressed his concerns about the music to the mother, who stated that she would speak to the child about it. The father testified at the hearing in this matter that he had not wanted the mother to speak to the child about music on the child’s telephone. The mother testified that she had not been aware that the child was downloading music and that she had spoken to the child about that and about the song the child had downloaded; the mother stated that she believed that it was appropriate that she speak to the child about the matter.
The mother testified that she did not believe that the child was stressed when the child was in her home, and she stated that the only times the child seems stressed or upset are on occasions when the father has discussed the court proceedings with the child. We note that each party accused the other of speaking to the child about the ongoing litigation or about court orders. The father testified that the mother had shown or had told the child about a court order requiring him to return the child by a certain time from weekday visitation. The father stated that the child became upset if he returned her late from that weekday visitation.[2] The mother denied telling the child about any court proceedings, and she stated that the child seemed upset or stressed only when the father talked to the child about the court proceedings that have been maintained throughout the child’s life. The mother also testified that the child had complained that, when she visits the father, the father often did not spend time with her because he spent a lot of time on his computer; the father disputed that he spends a lot of time on a computer when the child visits him.
The mother stated that the child had indicated that the father had discussed court proceedings with the child and that the father had told the child that the mother, a church secretary, and the maternal grandmother had lied during a previous court hearing. The mother testified that she responded to the child’s statements by saying that they had not lied and that the father should not be discussing the litigation with the child.
The mother also stated that, when the child returned from a visitation with the father shortly before the hearing in this matter, the child was extremely distressed, crying, and angry with the mother. The mother stated that the child had screamed at her that she was mean because the father had told the child that the mother and her attorney had placed a “hold” on his account. According to the mother, the child stated that the father had informed her that, as a result of the purported actions by the mother and her attorney, he would have no food, no place to live, and no vehicle to drive. As discussed in the procedural history, at approximately the same time this matter was before the trial court, the State of Alabama and the mother had asserted claims against the father concerning the father’s failure to pay child *318 support and seeking to recover past-due child support, which at that time totaled approximately $35,000. The mother stated that, in response to the child’s accusations, she had attempted to explain to the child, without making the father look bad, that she and her attorney had not caused the situation in which the father found himself.
The mother stated that she did not believe that anyone should be discussing the ongoing litigation with the child. The mother also testified that, if the father had not discussed the issues -with the child, the child would not have known what a courtroom was or anything about homosexuality. The father testified, however, that the child had asked him questions concerning homosexual relationships.
In questioning the mother’s ability to properly attend to the child’s health issues, the father testified that the mother had allowed the child to make the entire decision about whether to have braces placed on her teeth. The mother denied that allegation; she stated that the child had input regarding the timing of having those braces installed. The mother explained that the dentist had stated that if the child was not committed to taking care of the braces, there would be little point in putting them on the child and, therefore, that she had consulted with the child to see if the child was ready for the braces. At the time of the hearing in this matter, the child was wearing the braces.
The father also submitted into evidence the deposition of Linda J. Gottlieb, a psychologist from New York, who testified that she had studied the issue and believed that a child’s best interests were served by living 50% of the time with each parent. Dr. Gottlieb testified that she was testifying as a general witness to advocate for the 50-50 custody arrangement of which she is a proponent and that she had no particular knowledge of the facts of this case. Dr. Gottlieb also testified that she had provided the father the list of questions he had asked during the deposition.
On appeal, the father argues that the trial court erred in denying his petition to modify custody of the child. In order to modify the existing award of primary physical custody to the mother, the father was required to meet the standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984). Under that standard, the father was required to present evidence demonstrating that a change in custody would materially promote the child’s welfare and that the disruption caused by the change in custody would be offset by the advantages of that custody change. McLendon, supra. See also P.A.T. v. K.T.G., 749 So.2d 454, 456 (Ala.Civ.App.1999) (discussing the application of the McLendon standard to the modification of an award of primary physical custody).
The father first argues that the trial court erred in failing to modify custody because of the mother’s relationship with her boyfriend.
“In custody cases, indiscreet behavior, such as living with someone of the opposite sex without the benefit of marriage, is a factor to be considered, and there must be evidence presented showing that such misconduct has a substantial detrimental effect on the children. Smith v. Smith, 464 So.2d 97 (Ala.Civ.App.1984). Such misconduct is not evidence of a substantial detrimental effect on a child in the absence of any proof of harm to the child. Jones v. Haraway, 537 So.2d 946, 947 (Ala.Civ.App.1988).”
Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993).
We note that the father filed a November 10, 2010, petition to modify custody following the August 2010 incident; in that petition, the father asserted that *319 the mother’s conduct with her boyfriend, together with her alleged failure to afford him “frequent and meaningful additional parenting time,” constituted a material change in circumstances warranting a modification of custody. The father withdrew that claim in November 2012, during a hearing on a purported postjudgment motion filed in reference to the rulings the trial court entered and that the father appealed in Davis III and Davis IV. At that time, the father had already, on July 30, 2012, initiated the new modification action that is the subject of the current appeal; in the July 30, 2012, modification petition, the father made the same allegations he had made in his 2010 petition, as well as new allegations. We note that, “[i]n order to avoid protracted and repeated litigation over the custody of a child, Alabama law requires a party to prove a material change in circumstances since the entry of the last judgment in order to obtain a modification of the custody of the child.” E.F.B. v. L.S.T., 157 So.3d 917, 923 (Ala.Civ.App.2014). In this case, the father withdrew his earlier, 2010 modification claim before the trial court ruled on that claim. Accordingly, the allegations asserted in that earlier modification action have not been considered as part of a custody ruling by the trial court, and, therefore, they were properly before the trial court to consider in determining whether to modify custody. However, the fact that the father withdrew his 2010 custody-modification claim, i.e., that he did not consider it to be sufficiently significant to warrant prosecuting it to a judgment, could properly bear on the weight the trial court assigned to those allegations.
The father acknowledged at the hearing in this matter that the mother’s boyfriend does not stay at the mother’s home overnight. The father based his 2010 custody-modification petition, in part, on the mother’s relationship with the boyfriend and the child’s concerns regarding that relationship, but he later withdrew that petition. In support of his July 30, 2012, petition, the father contended that the mother visits the boyfriend and that the child “is aware of’ the nature of the mother’s ongoing relationship -with the boyfriend. However, the father does not argue, nor has he presented evidence indicating, that the mother’s relationship with the boyfriend has had a “substantial detrimental effect” on the child. See Phillips v. Phillips, 622 So.2d at 412.
The father focuses most of his argument pertaining to the denial of his claim seeking the modification of custody to his objection to the mother’s allowing the child to be exposed to Tina and Tifanie. The evidence indicates that, for some unspecified period, Tina provided after-school care for the child while the mother worked. However, the mother enrolled the child in day care because, she said, neither Tina nor the father was able to provide a routine schedule for providing after-school care for the child. The record indicates that the child spends other time with Tina, with whom she has a close relationship, often in the presence of Tifanie. The record also indicates that the child spent several days with Tina and Tifanie during the summer of 2013, between the dates of the final hearing in this matter. The father-presented evidence concerning his moral objéctions to the relationship between Tina and Tifanie, but he presented no evidence regarding its effect on the child.
The father relies in his brief on appeal on the special writing in Ex parte H.H., 830 So.2d 21 (Ala.2002), and on Ex parte D.W.W., 717 So.2d 793 (Ala.1998) (plurality opinion), and Ex parte J.M.F., 730 So.2d 1190 (Ala.1998). However, all of those cases address homosexual conduct on the part of a parent.
*320 In this case, however, the facts do not involve a parent who is engaging in homosexual activity; the father has not alleged that the mother is homosexual or that the child is living in a home with Tina and Tifanie. Rather, the father seeks to modify custody based on the mother’s allowing the child to visit her aunt and the aunt’s alleged homosexual partner. The child’s exposure to such a lifestyle is a factor the trial court may consider in determining whether to modify custody; however, we decline to hold the trial court in error for failing to modify custody solely because of that factor. The facts of this case do not warrant a custody modification solely based on the authorities cited above, which pertain to homosexual conduct on the part of a child’s parent.
“The standard of review in child-custody cases in which evidence is presented ore tenus is well established: .
“ ‘When evidence in a child custody case has been presented ore tenus to the trial court, that court’s findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing. See Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), wherein this Court, quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993), set out the well-established rule:
“ ‘ “ ‘Our standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, Payne v. Payne, 550 So.2d 440 (Ala.Civ.App.1989), and
Vail v. Vail, 532 So.2d 639 (Ala.Civ.App.1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court’s discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. Gamble v. Gamble, 562 So.2d 1343 (Ala.Civ.App.1990); Flowers v. Flowers, 479 So.2d 1257 (Ala.Civ.App.1985).’ ”
“ ‘It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. See the cases collected at 3 Ala. Digest 2d Appeal & Error § 846(5) (1993).
[[Image here]]
“‘Neither the Court of Civil Appeals nor this Court is allowed to reweigh the evidence in this case. This case, like all disputed custody cases, turns on the trial court’s perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses ... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.’
“Ex parte Bryowsky, 676 So.2d 1322, 1324-26 (Ala.1996).”
Ex parte H.H., 830 So.2d at 25.
In this case, the father presented evidence indicating that the mother visits her boyfriend and that the child does not approve of the relationship. He also presented evidence indicating that the child visits her aunt, and the evidence tends to *321 indicate that the aunt is involved in a homosexual relationship with another woman. The aunt relocated approximately an hour away from the mother and the child, and, at some point before that, the mother had ceased leaving the child with the aunt after school. The evidence indicated that the child had spent several days with the aunt and Tifanie during the summer. The record contains no evidence pertaining to the effect of that relationship upon the child.
The father also presented evidence indicating that he is concerned that the mother is not adequately addressing the child’s allergy and weight issues. The mother disputed that evidence. The father also testified that he believed that stress caused some of the child’s weight issues since 2010. The father testified that the mother had informed the child about the contents of a court order that determined the times of his visitation with the child; he did not state that the mother had discussed the court proceedings with the child. However, he admitted that the child was extremely upset when she learned that the father had made an audio recording of a conversation he had had with the child when she had expressed concerns about the mother to him. The mother also testified that the child had been upset after returning from a recent visitation with the father, during which, according to the mother, the father had told the child he would have no place to live or food to eat because of the mother’s actions in the child-support action. The father also denied that he had contributed in any way to the child’s stress. However, the record contains evidence indicating that the father has discussed the ongoing litigation between the parties with the child and has involved the child, or evidence he obtained from the child, in his litigation efforts and that the father has failed to recognize that his own conduct could contribute to the child’s stress.
We also note that the trial court could have discounted the father’s claims that he sought a modification of custody solely because he is concerned about the child’s welfare. The evidence is undisputed that the father has not contributed to the child’s basic support since 2008.[3] Davis III, supra, and Davis TV, supra. A noncustodial parent’s failure to pay child support usually will not warrant a denial of that parent’s request to modify custody. However, in determining the father’s credibility with regard to his stated motives in seeking to modify custody, the trial court could have concluded, in light of the father’s undisputed failure to contribute to the child’s basic food and shelter needs since 2008, that the father’s concerns about the child’s welfare were overstated or that the father was seeking to avoid the future payment of a child-support obligation.
Before the trial court, the father presented evidence regarding his concerns about the mother’s parenting. The mother presented evidence disputing much of the father’s evidence. The presumption of correctness this court affords to the trial court’s judgment “is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility[, which is].... especially important in child-custody cases.” Ex parte Fann, 810 So.2d 631, 633 (Ala.2001). Further, we note that, when the trial court does not make findings of fact, an appellate court must assume that the trial court made those findings necessary to support its judgment. Ex parte Bryowsky, 676 *322 So.2d 1322, 1324 (Ala.1996): This court is not allowed to reweigh the evidence, and we may reverse the trial court’s judgment only when the evidence reveals that it is plainly and palpably wrong. Ex parte H.H., 830 So.2d at 25. We cannot say that the father has demonstrated that the trial court erred in determining that he had not met his burden under McLendon so as to warrant a modification of custody.
We note that the father has argued as a separate issue in his appellate brief that the trial court erred in failing to fashion a custody award affording each party custody of the child for 50% of the time. We note that, in his appellate brief, the father attempts to characterize his request to have a 50-50 custodial arrangement as a request to modify visitation. However, it is clear that, in seeking “equal parenting time,” the father is seeking an award of joint physical custody of the child; an award of joint physical custody can, but does not necessarily, mean that each parent receives an equal custodial period. See § 30-3-151(3), Ala.Code 1975 (defining “joint physical custody” as “[pjhysical custody [that] is shared by the parents in a way that assures the child frequent and substantial contact with each parent. Joint physical custody does not necessarily mean physical custody of equal durations of time.”); see also E.F.B. v. L.S.T., 157 So.3d at 922 (concluding that a judgment that awarded parents custody for “an approximately equal amount of time” constituted an award of joint physical custody); and Kilgore v. Kilgore, 100 So.3d 544, 546 (Ala.Civ.App.2012) (recognizing a judgment awarding the parties alternating weekly custody of a child as awarding joint physical custody). Thus, we do not construe the father’s argument that he should be awarded equal parenting time as requesting a change in his visitation rights but, rather, as requesting a modification of the existing primary-physical-custody award to the mother to one awarding joint physical custody. As stated earlier in this opinion, to prove entitlement to a modification of the previous award to the mother of primary physical custody of the child, the father was required to meet the McLen-don standard. See Cochran v. Cochran, 5 So.3d 1220, 1226 (Ala.2008) (The McLen-don standard applies when a party seeks to modify an award of primary physical custody to an award of joint physical custody.); and Adams v. Adams, 21 So.Sd 1247, 1252 (Ala.Civ.App.2008) (“A parent seeking to modify a custody judgment awarding primary physical custody to the other parent must meet the standard for modification of custody set forth in Ex parte McLendon.”). We have held, above, that the trial court did not err in determining that the father did not meet the McLendon standard. Accordingly, we do not address this argument further.
The father next argues on appeal that the trial court did not have subject-matter jurisdiction to award the mother an attorney fee for defending the action in the trial court. In response to the father’s July 30, 2012, petition to modify custody, the mother filed an answer and a counterclaim. In that filing, the mother asserted a contempt claim seeking to require that the father show cause why he refused to pay child support and a child-support ar-rearage, and she sought an award of an attorney fee.
The mother- later moved to dismiss her contempt counterclaim. The father contends on appeal that, in abandoning that claim, the mother abandoned her request for an attorney fee. However, we do not construe the attorney-fee request as asserted in the mother’s answer and counterclaim to be based solely on the contempt claim that was dismissed as a part of the action that forms the basis for this appeal. *323 It is clear from the language of the counterclaim that the mother was also seeking an award of an attorney fee for having to defend the father’s custody-modification action.
Further, even assuming that the mother’s entire request for an award of an attorney fee was dismissed as a part of the dismissal of the contempt claim, the mother made an oral request for an award of an attorney fee during the final hearing of this matter, and, during the hearing, she presented evidence in support of that request. The father did not object to the mother’s request for an award of an attorney fee or the trial court’s consideration of that request. Accordingly, we conclude that, even assuming that the mother’s attorney-fee claim pertaining to defending the father’s action was dismissed, that claim was orally reasserted and tried by the implied consent of the parties pursuant to Rule 15(b), Ala. R. Civ. P. See Rule 15(b), Ala. R. Civ. P.; and Committee Comments on 1973 Adoption of Rule 15 (“Under the rule where evidence is introduced or an issue raised with the express consent of the other party, or without objection from him, the pleadings ‘shall’ be deemed amended to conform to such evidence.”).
In arguing that the trial court lacked subject-matter jurisdiction to consider the mother’s request for an attorney fee, the father bases his argument on his assertion that the mother failed to pay a filing fee in support of her counterclaim. See § 12-19-71(a)(8), Ala.Code 1975 (providing that a filing fee for a counterclaim in civil cases “shall be collected”). Although the failure to pay a filing fee when an action is initiated has been held to be jurisdictional, a failure to pay a filing fee when a counterclaim is filed is not jurisdictional and may be cured. Hicks v. Hicks, 130 So.3d 184, 189 (Ala.Civ.App.2012) (explaining that, in Espinoza v. Rudolph, 46 So.3d 403 (Ala.2010), our “supreme court distinguished between the necessity of a filing fee alongside a complaint, which, in accordance with De-Gas, Inc. v. Midland Resources, 470 So.2d 1218 (Ala.1985), is jurisdictional, and the failure to pay a docket fee at the time a counterclaim is filed, which, it determined, may be subsequently cured”). Regardless, it does not appear that the mother paid a filing fee in support of her counterclaim alleging contempt, which was later dismissed.
The father argues that the mother’s request for an attorney fee constituted a counterclaim and that her failure to pay a filing fee divested the trial court of jurisdiction to consider that request. However, as is explained below, we do not agree with the father’s assertion that the mother’s request for an award of an attorney fee for defending the father’s custody-modification action was a separate claim for relief or cause of action warranting the payment of a filing fee under § 12-19-71 (a)(8).
A request for an attorney fee has been held to be collateral to a claim on the merits. Edwards v. Edwards, 999 So.2d 939 (Ala.Civ.App.2008); and Morrison v. Morrison, 1 So.3d 1052, 1053-54 (Ala.Civ.App.2008). This court has explained:
“‘[A] decision on the merits’ of the claims asserted by the parties is a ‘ “final decision” ’ even when ‘there remains for adjudication a request for attorney’s fees attributable to the case.’ Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202-03, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988); see also In re Porto, 645 F.3d 1294, 1299 (11th Cir.2011) (‘[T]he Supreme Court has established a bright line rule that the issue of attorney’s fees is always collateral to the merits, and a decision on the merits, even if the attorney’s fees issue remains unresolved, is immediately appealable....’); and State *324 Bd. of Educ. v. Waldrop, 840 So.2d 893, 899 (Ala.2002) (‘[A] decision on the merits disposing of all claims is a final decision from which an appeal must be timely taken, whether a request for attorney fees remains for adjudication.’).”
Wolfe v. JPMorgan Chase Bank, N.A., 142 So.3d 697, 699 (Ala.Civ.App.2013) (footnote omitted).
In this case, the mother’s request for an attorney fee was collateral to the issues raised in the father’s custody-modification action. That request for an attorney fee did not constitute a cause of action or a claim for relief such that the payment of a filing fee was required under § 12-19-71(a)(8), which governs the payment of a filing fee for a counterclaim. Wolfe v. JPMorgan Chase Bank, N.A., supra; Edwards v. Edwards, supra. Accordingly, because no filing fee was due with regard to the mother’s request for an attorney fee, we must reject the father’s argument that the trial court lacked subject-matter jurisdiction to consider or rule on that request.
The father also contends that the trial court erred in awarding the mother the attorney fee. The father argues that the trial court failed to properly state the reasons pursuant to which it awarded an attorney fee, and he cites a number of cases in support of his contention that the trial court was required to make such findings. The father is correct that the authorities upon which he relies require a trial court to consider a number of factors in making an attorney-fee award and to make some findings or explanation regarding the factors it relied upon in awarding an attorney fee; however, all the cases upon which the father relies are based on circumstances not involving domestic-relations issues. See, e.g., Pharmacia Corp. v. McGowan, 915 So.2d 549, 552-53 (Ala.2004) (involving a guardian ad litem fee); Madison Cnty. Dep’t of Human Res. v. T.S., 53 So.3d 38, 42 (Ala.2009) (involving a tort contingency fee); and Huntley v. Regions Bank, 807 So.2d 512, 517-18 (Ala.2001) (involving a claim for fees pertaining to a breach-of-contract claim).
With regard to an award of an attorney fee in a domestic-relations action, this court has stated:
“ ‘It is without question that the trial court has wide discretion in awarding attorney fees to parties in a divorce proceeding. Hansen v. Hansen, 401 So.2d 105, 107 (Ala.Civ.App.1981).
“ ‘ “Whether to award an attorney fee in a domestic relations case is within the sound discretion of the trial court and, absent an abuse of that discretion, its ruling on that question will not be reversed. Thompson v. Thompson, 650 So.2d 928 (Ala.Civ.App.1994). ‘Factors to be considered by the trial court when awarding such fees include the financial circumstances of the parties, the parties’ conduct, the results of the litigation, and, where appropriate, the trial court’s knowledge and experience as to the value of the services performed by the attorney.’ Figures v. Figures, 624 So.2d 188, 191 (Ala.Civ.App.1993). Additionally, a trial court is presumed to have knowledge from which it may set a reasonable attorney fee even when there is no evidence as to the reasonableness of the attorney fee. Taylor v. Taylor, 486 So.2d 1294 (Ala.Civ.App.1986).” ’
“Martin v. Martin, 85 So.3d 414, 423 (Ala.Civ.App.2011) (quoting Glover v. Glover, 678 So.2d 174, 176 (Ala.Civ.App.1996)).”
J.D.H. v. A.M.H., 123 So.3d 979, 987-88 (Ala.Civ.App.2013); see also S.R.E. v. R.E.H., 717 So.2d 385, 388 (Ala.Civ.App. *325 1998) (“[I]n cases that include a claim for modification, the award of an attorney fee is within the sound discretion of the trial court.... An award of such a fee will not be set aside unless the trial court plainly and palpably abused its discretion in assessing the fee.”). The father has not cited caselaw requiring a trial court to make findings such as those required in contexts other than domestic-relations cases, and this court’s research has found no such caselaw. Accordingly, we cannot say that the father has demonstrated error with regard to this issue.
The father also argues in his brief on appeal that he cannot afford to pay the mother’s attorney fee. The father did not present evidence regarding his income during this proceeding. The mother presented evidence indicating that, because the father has refused to pay child support for the benefit of the child, she has relied on regular financial assistance from her family members in order to meet the basic monthly expenses for her and the child. The mother testified that she had borrowed amounts from her mother and her sister to pay her attorney fee in this action and that she planned to repay them when she received a refund from the overpayment of her income taxes. Further, the father did not prevail in this custody-modification action, and this court has affirmed the trial court’s judgment. We conclude that the father has failed to demonstrate that the trial court erred in awarding the mother an attorney fee below. We note that the father has not challenged on appeal the specific amount of the attorney fee awarded to the mother, and, therefore, that issue is waived. Courtaulds Fibers, Inc. v. Long, 779 So.2d 198, 202 n. 1 (Ala.2000).
The mother’s request for an attorney fee on appeal is granted in the amount of $1,500.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and DONALDSON, JJ., concur.
THOMAS, J., concurs in the result, without writing.
MOORE, J., recuses himself.

. It is not clear when or if the mother received the father’s text message that he had picked up the child.

. The father also alleged that the mother made the child "redo” all of the homework the child worked on during his weekday visitation. The mother disputed that testimony and stated that she checked to make sure the child had completed all the homework and that she made the child finish any homework that she had not completed. The father insisted that he ensures that the child completes her homework during his weekday visitation.

. The father argued below that he paid for braces and for some clothing for the child. However, the father made no contribution toward the child’s basic support needs, such as housing or food, during the times she was not visiting him.